Filed 4/24/15  In re O.S. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re O.S., a Person Coming Under the Juvenile Court Law. | H041439 (Monterey County Super. Ct. No. J46619) |
| MONTEREY COUNTY DEPARTMENT OF SOCIAL & EMPLOYMENT SERVICES, Plaintiff and Respondent, v. T.S., Defendant and Appellant. | |

**INTRODUCTION**

Appellant T.S. is the father of O.S., who is the child at issue in the dependency proceedings.  Appellant appeals an order terminating his parental rights, arguing that the juvenile court erred in finding that the beneficial parental relationship exception (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i))[1] did not apply.  As appellant failed to raise the beneficial parental relationship exception in the proceedings below and because we find this exception inapplicable, we will affirm the termination order.

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Dependency Petition and Detention Hearing*

On July 9, 2012, the Monterey County Department of Social and Employment Services (the Department) filed a dependency petition under section 300, subdivisions (b) and (g) on behalf of 22-month-old O.S.

The petition first alleged that both appellant and the mother had failed to protect O.S. (§ 300, subd. (b)). As to that ground, the petition alleged that appellant and the mother had four children together. The three other children, were previously dependents of the court between 2007 and 2011 due to the parents' drug problems and chronic homelessness. All three of the other children were adopted. The petition also alleged that the mother had used drugs while she was pregnant with O.S., but neither the mother nor O.S. tested positive for drugs. Additionally, the petition alleged that on June 27, 2012, an incident occurred, in which O.S. was reportedly injured when appellant engaged in a "tug of war" with O.S.'s maternal grandmother while both were under the influence of drugs. Appellant was subsequently arrested for assault, child endangerment, and a violation of his probation. After the arrest, the officers allowed O.S. to remain in her mother's care.

Days after the June 27 incident, a social worker interviewed the mother. The social worker noted that the mother appeared to be under the influence, and the mother admitted that she used methamphetamines earlier that day. She also admitted that she had been using drugs for the past month. The mother told the social worker that appellant was verbally abusive towards her and that she suspected that he was using methamphetamines. Appellant told the social worker that the last time he used methamphetamines was in 2010. Following the social worker's interviews, a team decision making meeting was held. The team decided that due to the mother's current drug use, the father's incarceration, and his suspected drug use, O.S. was to be removed from her parents' care.

As a second statutory ground, the petition alleged that O.S. had been left without provision for support (§ 300, subd. (g)). As to that ground, the petition alleged that appellant was incarcerated in the Monterey County Jail and was unable to care for O.S.

At the detention hearing on July 11-12, 2012, the juvenile court detained O.S. and committed her to the Department's custody.

### The Jurisdiction and Disposition Report and Hearing

In the jurisdiction report, the Department recommended that the juvenile court amend the petition to eliminate the allegation under section 300, subdivision (g) due to the fact that appellant had since been released from incarceration. As amended, the Department recommended that the court sustain the petition. The Department also recommended that the court remove the child from her parents, deny reunification services to the mother, and offer reunification services to the father.

The jurisdiction report summarized appellant's criminal history, which dated back to 1985 and included arrests and/or convictions on charges such as second degree burglary, escaping from jail by force or by violence, possessing narcotics or controlled substances, possessing controlled substance paraphernalia, violating parole, battery on a spouse, and a hit and run. His most recent arrest was in connection to the June 27, 2012 incident. He had since been released from jail and his probation was reinstated.

The report noted that both parents had a "long documented history of substance abuse that has interfered with their ability to parent any of their children." However, appellant maintained that he was clean and sober since March 18, 2010, and he had tested negative for drugs in a recent hair follicle test. Appellant was also seeing therapists for his anxiety and depression issues.

The report stated that O.S. was parented by her parents for the first part of her life. There was "no doubt" that both of O.S.'s parents loved her very much. The report also acknowledged that appellant "appears to be committed to the reunification process and engaging in services." The Department recommended reunification services to the father

3

as he "has demonstrated that he has been clean and sober, compliant with probation, and has stabilized his mental health."

At the jurisdiction and disposition hearing on September 12, 2012, appellant submitted on the report, and the juvenile court adopted the Department's recommendation and granted reunification services to appellant. The court denied reunification services to the mother.

### *The Six-Month and 12-Month Review Status Reports and Hearings*

In the six-month status review, the Department reported that appellant had been actively participating in therapeutic groups, attending parenting courses, and had been compliant with his probation conditions. The report noted that appellant was working on his recovery from substance abuse and that he was attending Alcoholics Anonymous (AA) meetings on a regular basis. The report also stated that appellant had obtained a part-time job, and was living at Sunflower Gardens, a housing unit for low-income adults with psychiatric disabilities. The report noted that appellant would need to secure other housing if he wished to reunify with O.S. The Department also reported that appellant was being treated for his depression and was taking medication, but he was mentally stable at the time. The report stated that appellant had twice a week supervised visitation with O.S. Appellant consistently showed up on time to all his visits, brought toys for O.S., and interacted with her. However, appellant was overly affectionate at these visits by constantly touching and kissing O.S. This demonstrated a lack of understanding of O.S.'s developmental needs and a lack of understanding that such affection was over-stimulating for O.S. Additionally, the report stated that appellant had a difficult time reading O.S.'s cues and was invasive of her personal space. The Department recommended that the juvenile court continue appellant's reunification services. After an uncontested hearing on February 27, 2013, the court ordered the continuation of the reunification services for six more months.

4

In the 12-month status review report, the Department reported that O.S. continued receiving services due to concerns about delays in her development as a result of substance exposure in utero. After an assessment, O.S. was found to have significant developmental delays in multiple areas. O.S. also received weekly occupational therapy due to issues with her vestibular postural stability and muscle and pelvic tone issues, which caused her to fall down frequently. O.S.'s caregivers reported that she had night terrors, which consisted of her screaming at night. O.S.'s caregivers also expressed concerns about her behavior after her visits with her father. These behaviors included self-mutilation (pinching/picking at herself), excessive tiredness, excessive stress eating, aggressive behavior, being emotionally fragile and excessively needy, and regressing in her language abilities. However, the report noted that it was difficult to assess her behavior due to her age.

During this review period, appellant had five hours of supervised visits and one hour of unsupervised visits with O.S. per week. The status report stated that father had successfully completed a parenting training program and continued receiving parenting services. The Department increased appellant's parenting responsibilities, which included him bringing a diaper bag to visits, bringing O.S. a dinner once a week, and washing her clothes. Appellant had continued with his AA meetings, maintained his part-time job, and applied for housing. Appellant had also continued to meet with a therapist and was receiving treatment for his depression and domestic violence issues. Appellant was consistent in showing up on time for his visits, but had failed to show up to two visits because he did not write the appointments down. Appellant was also progressing in his case plan, and it appeared that he genuinely cared for O.S. However, he still had difficulties in reading her cues and setting boundaries. Additionally, he minimized his role in the events leading to the dependency proceedings and demonstrated a lack of insight into his domestic violence issues. The Department recommended a continuation of appellant's reunification services. At the 12-month status review hearing

on August 28, 2013, the juvenile court followed the Department's recommendation and continued reunification services for another six months.

*The 18-Month Status Review Report and Hearing*

In the 18-month status review report, the Department recommended that appellant's reunification services be terminated and that the matter be set for a permanency planning hearing.

Appellant's visitation during this review period had increased to 12 hours of unsupervised visits with O.S. per week and an additional 10 to 12-hour visits twice a month. Appellant continued to participate in several parenting services. One of the service providers noted that appellant was working on reading O.S.'s cues and setting boundaries for her and that appellant was "doing a great job of 'sticking with it.' " The provider also commented that it was "clear [O.S.] is attached to her father." Appellant also attended occupational therapy sessions with O.S. The occupational therapist reported that appellant continued to have difficulties reading O.S.'s cues. In one instance, O.S. wanted to sit and snuggle, but appellant wanted to begin the activities. He also asked O.S. a lot of questions even though he was admonished several times not to do so.

Appellant was asked to take the lead in O.S.'s medical visits, but he exhibited a difficult time remembering and articulating things. He had to carry around a notebook to help him remember details, but did not have his notebook with him at several of O.S.'s medical appointments. Appellant was thus unable to provide detailed information to the doctors about O.S.'s medical changes, her medication, and other such information about her medical needs.

Appellant tested negative for all substances on the hair follicle test. Appellant stated that he " 'stayed clean and sober to be a good dad.' " The Department was concerned with this statement because sober living requires one to stay clean and sober for oneself first. "Staying clean and sober for one's children increases the likelihood that

6

one may relapse." Appellant was still living at Sunflower Gardens and was on the waitlist for another housing unit. He also applied for Section 8 housing.

Appellant continued treatment for his anxiety, and he was "making slow, but steady progress" in therapy. He was working with a therapist on his domestic violence issues. He was also attending all of his appointments with the social worker. However, the social worker observed that recently, appellant had been "breaking down emotionally." For instance, appellant left a voicemail, in which he yelled and threatened the social worker. The Department was concerned about appellant's resorting to behaviors associated with domestic violence.

The Department noted that it had major concerns that O.S. had nightly night terrors, which began while she was still in her parents' care. It was also concerned about her self-mutilation and other such problematic behaviors she had exhibited after her visits with her father. The Department opined that O.S. "does not feel safe for whatever reason." The Department was concerned about appellant's ability to report accurately, as he demonstrated his failure to do so after therapy sessions. Moreover, at a team decision meeting, appellant stated that he wanted O.S. to be returned to him so that he could " 'show the court' " he could do it. Appellant failed to see how it would traumatize O.S. if she was returned to him prematurely and then removed from his care. Appellant also demonstrated that he was slow to make progress in his parenting skills. It took him several month to stop getting in O.S.'s face or asking her too many questions during his visits. There were also several instances where O.S. would return from her visits with a dirty diaper or with other hygiene issues. Appellant was slow to resolve these issues.

The Department concluded that based on these concerns, returning O.S. to appellant would "create a substantial risk of detriment to her safety, protection, physical, and emotional well-being." The Department opined that appellant would need additional time in order for O.S. to be safely returned, but appellant did not meet the criteria for extending reunification services to the 24-month hearing.

On March 4, 2014, the Department submitted an addendum report, in which the Department continued to recommend that the juvenile court terminate reunification services. The report noted an incident where appellant told O.S. that her mother was in the hospital because her boyfriend had hurt her badly. As a result, O.S. became "very hyper" and repeatedly said " 'My mommy go to the doctor.' " Appellant did not understand how telling O.S. this information would impact her. Appellant also was late for two visits and struggled with following established visitation schedules as well as schedule changes. Additionally, there was one incident where O.S. was crying after a visit. She stated " 'Daddy hit me.' " When asked about it, she pointed to her back. After another visit, O.S. was crying "hysterically." Appellant told the caregiver that she had fallen down earlier but he " 'wasn't sure why she was still crying.' " O.S. cried the entire afternoon and evening, and she said that " 'My daddy mean at visit' and 'My daddy hit me.' " On February 21, 2014, the Department informed appellant that they would be suspending visitation because O.S. was reportedly having a difficult time after the visits.

On March 18, 2014, the juvenile court held a contested 18-month status hearing. Appellant's sister B.L, social worker Heather Molitor, and appellant testified for appellant, and the Department submitted the matter based on its reports. The court acknowledged that appellant "was a different parent now than he was in 2012." The court also recognized that appellant completed a 12-step program for sobriety, took several parenting courses, and had improved upon his parenting skills. Nonetheless, the court stated that it was unsure that appellant had "the ability to accomplish reunification with his daughter." Specifically, the court noted that appellant had issues of asking O.S. too many questions, was unable to read her cues, and demonstrated that he did not know how to deal with her medical issues. While appellant was consistent with his visits in the beginning, the court noted that he had missed two visits more recently. The court stated that the biggest concern was O.S.'s behavior after visits with appellant, which included having night terrors, having meltdowns, going to sleep immediately, refusing to eat, and

8

self-mutilating. The court pointed out that O.S. did not exhibit those behaviors in her current foster home or after visits with her mother. The court concluded that by a preponderance of evidence, there was substantial risk to O.S.'s physical and emotional well being if she were to be returned to appellant's care. The court found that it was improbable that appellant would be able to accomplish reunification between then and the 24-month period, and it did not extend reunification services.

### *The Section 366.26 Report and Hearing*

In the section 366.26 report, the Department recommended terminating parental rights and recommended adoption as the permanent plan for O.S. The report described O.S. as a "smiley and charming toddler girl who continues to exhibit less anxiety and more emotional stability, as visitation with her father has dramatically reduced." The report noted that appellant's visits had been reduced to supervised bimonthly visits in May 2014 and monthly visits for June and July 2014. Appellant did not show up to his visit scheduled for June 12, 2014. The report also noted that O.S. had been living in a foster home for 20 months. In that time, she had bonded with the family, especially with her foster sister, and had made "notable developmental gains." O.S. calls her foster parents " 'Mommy' " and " 'Daddy Tim,' " and she was considered a member of their family. The foster parents stated they were willing to commit to the permanent plan of adoption and said that they were open to some sort of contact with O.S.'s birth family in the future. The Department reported that the foster parents had demonstrated the ability to protect O.S. and to provide an environment where she thrives.

On July 15, 2014, the juvenile court held the section 366.26 hearing. Appellant did not appear at the hearing. However, counsel generally objected to the Department's recommendation on his behalf and the court also recognized appellant's objection in the Department's report. The court followed the recommendation of the Department and terminated appellant's and the mother's parental rights and found that O.S. was adoptable. Appellant filed a timely notice of appeal from this order.

9

On appeal, appellant contends that the juvenile court erred in terminating the parental rights because the beneficial parental relationship exception applied (§ 366.26, subd. (c)(1)(B)(i)). However, appellant waived the argument on appeal by failing to assert the application of the beneficial parental relationship exception in the court below. (*In re Erik. P.* (2002) 104 Cal.App.4th 395, 403 (*Erik P.*).) In any event, he did not meet his burden to prove that the exception applied.

" 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.] It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53 (*Celine R.*).) At a section 366.26 hearing, adoption is the preferred choice. (*Celine R., supra,* 31 Cal.4th at p. 49; § 366.26, subds. (b) & (c).) Section 366.26 states, in pertinent part: "If the court determines, based on the assessment provided as ordered under [applicable statutory provisions], and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court *shall* terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1), italics added.) There are statutory exceptions to the general rule requiring adoption and the concomitant termination of parental rights. These exceptions, however, " 'must be considered in view of the legislative preference for adoption.' " (*Celine R., supra,* at p. 53.) The parent has the burden to show that a statutory section applies. (*Ibid.*)

## A. Appellant Waived The Argument that the Beneficial Parental Relationship Exception Applied

A parent must raise any relevant exception at the section 366.26 hearing, or waive the right to raise the exception on appeal. (*Erik. P., supra*, 104 Cal.App.4th 395 at p. 403.) "The application of any of the exceptions enumerated in section 366.26,

subdivision (c)(1) depends entirely on a detailed analysis of the relevant facts by the juvenile court. [Citations.] If a parent fails to raise one of the exceptions at the hearing, not only does this deprive the juvenile court of the ability to evaluate the critical facts and make the necessary findings, but it also deprives this court of a sufficient factual record from which to conclude whether the trial court's determination is supported by substantial evidence. [Citation.] Allowing the [parent] to raise the exception for the first time on appeal would be inconsistent with this court's role of reviewing orders terminating parental rights for the sufficiency of the evidence." (*Ibid.*)

Appellant did not appear at the section 366.26 hearing. Though appellant generally objected to the Department's recommendation, he did not affirmatively raise the argument that the beneficial parental relationship exception applied. Thus, the argument is now waived. (*Erik. P.*, *supra*, 104 Cal.App.4th at p. 403.) However, even if we were to reach the issue on its merits, appellant did not meet his burden of proving the exception applied.

**B. The Beneficial Parental Relationship Exception Did Not Apply**

The beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) provides that a court need not terminate parental rights and order adoption where the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and the relationship constitutes a "compelling reason for determining that termination would be detrimental to the child." (*Ibid.*)

Appellant contends that he proved there was a beneficial parental relationship because he maintained regular visitation and that he established a "significant positive emotional attachment" with O.S. In support of his argument, appellant cites to several notations in the Department's status reports as well as other reports from the social worker and clinicians, noting that his love for O.S. was evident and that O.S. appeared to have bonded with him. Additionally, he contends that the detriment of terminating this relationship outweighs any benefits of permanency.

11

In order to meet the burden of proving the beneficial parental relationship exception, the relationship must "promote[ ] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome. . . ." (*Ibid.*)

" '[T]he parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child. [Citation.]' " (*In re C.B.* (2010) 190 Cal.App.4th 102, 126.) Factors to be considered in making this determination include the "age of the child," the "portion of the child's life spent in the parent's custody" and the " 'positive' or 'negative' effect of interaction between parent and child." (*Autumn H., supra,* 27 Cal.App.4th at p. 576; see also *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315 (*Bailey J.*).) " 'Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.' " (*Bailey J., supra,* at p. 1315.)

It is undisputed that appellant maintained regular visitation and contact with O.S. Nevertheless, the evidence, as a whole, reveals that O.S. did not have a "substantial, positive emotional attachment" with appellant. (See *Autumn H., supra,* 27 Cal. App.4th at p. 575.) The record shows that O.S. was removed from her parents' custody when she was only 22-months old. O.S., who was 3 years old at the time of the section 366.26 hearing, had been residing at her foster family's home since November 17, 2012. Thus, she had been residing with her foster family for almost half of her entire life. Most

12

notably, the reports reveal that O.S. exhibited anxious behavior after her visits with appellant. After her visits, she would self-mutilate, become excessively tired and excessively stressed, display aggressive behavior, and become more emotional. The Department reported instances where O.S. would return from visits upset and say " 'My daddy mean at visit' and 'My daddy hit me.' " The Department opined that O.S. "does not feel safe for whatever reason."

Even assuming that O.S. benefitted from the relationship with appellant, there was no evidence that those benefits outweighed the benefits she gained in a permanent home with her adoptive family. In fact, the Department reported that O.S.'s anxious behavior reduced and she gained more emotional stability as visits with appellant reduced. The Department also reported that O.S. did not display these anxious behaviors while she was at her foster home or after her visits with her mother. In contrast, the Department stated that O.S. was happy, developmentally thriving, and was emotionally stable in the foster home. O.S. had bonded with her foster family, especially her foster sister, and she referred to her foster parents as " 'Mommy' " and " 'Daddy Tim.' " In return, the foster family considered O.S. a part of their family and was committed to the permanent plan of adopting her. The evidence thus did not show that the benefits of continuing the relationship between appellant and O.S. outweighed any benefits of placing O.S. in a permanent home.

Accordingly, on this record, appellant did not meet his burden to show that the beneficial parental exception applied.

## DISPOSITION

The order terminating appellant's parental rights is affirmed.

13

_____

RUSHING, P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.